UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

KRISTY LAW, QUINCY BULLARD,       )
JOHN HALL, FRANCES PERRY, and     )
RITA LEE on behalf of             )
themselves and all similarly      )
situated,                         )
                                  )
          Plaintiffs,             )
                                  )
     v.                           )          Civil No. 3:05-0836
                                  )          Jude Echols
AMERICAN CAPITAL STRATEGIES,      )
LTD.,                             )
                                  )
          Defendant.              )

## MEMORANDUM

Pending before the Court are motions relating to Defendant's liability in this case. Plaintiffs have filed a Motion for Partial Summary Judgment (Docket Entry No. 123) in relation to the affirmative defenses filed by Defendant. Defendant has filed a Motion for Summary Judgment (Docket Entry No. 115) in which it contends that it is entitled to prevail on its affirmative defenses and thereby succeed on the question of liability. Both Motions have been fully briefed by the parties.

Also pending is a Motion to Strike filed by American Capital (Docket Entry No. 121). This too has been briefed by the parties.

## I.   FACTUAL BACKGROUND

This is an action under the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2101 et seq. Plaintiffs, on behalf of themselves and those they purport to represent, were former employees of Service Transport, a less-than-truckload common

1

carrier.  On May 5, 2005, Service Transport undertook massive layoffs and plant closures.  This lawsuit involves allegations that the undertaking was not done in accordance with the WARN Act.

Service Transport is not a party to this litigation as it is a defunct liquidating company under the protection of the United States Bankruptcy Court in Delaware.  The sole Defendant is American Capital Strategies, Ltd.  ("American Capital").

American Capital is a Business Development Company under the Investment Company Act of 1940.  It is a publicly traded company that provides investment capital to companies in need of capital for buyouts, growth, acquisitions and recapitalization.  It provided such capital to Service Transport and provided consulting services on financial reports and operations to Service Transport. Service Transport had its own management team and personnel policies and American Capital did not interfere with the day-to-day operations of Service Transport, although it did have a three-person Operations Team assigned by American Capital who served as consultants to Service Transport's management.

For several years, American Capital infused a great deal of money into Service Transport, including some $27 million in financing from the end of 2002 until the beginning of 2005.  A good portion of the money which was invested in, or loaned to, Service Transport was effectively forgiven by American Capital.

By the end of 2004, it was clear that Service Transport was performing poorly.  In rough chronological order, the events leading up to Service Transport's ultimate demise are as follows.

2

In December 2004, American Capital's Financial and Compliance Team ("FACT Team") prepared a quarterly report concerning Service Transport which stated, in part, that in order to preserve liquidity, payables had been stretched by an additional $600 million and payments on leases were to be skipped for four months, if possible. The report indicated that Service Transport faced the possibility of liquidation if it could not be successfully restructured and, in fact, an appraisal firm had performed a liquidation analysis of Service Transport by December 23, 2004.

During that same general time frame (late December 2004 or early January 2005), a report was prepared for American Capital which indicated that Service Transport was facing a seasonal, near-term liquidity shortage and requested all interested parties (equity, unsecured creditors/vendors, equipment lessors, terminal landlords, and its primary lender) aid in the maintenance of near-term solvency.

In January 2005, Service Transport's liability and workers' compensation insurer, Protective, informed Service Transport that by May 1, 2005, Service Transport needed to post additional letters of credit in the total amount of $2.1 million to secure its obligations to pay premiums. Service Transport did not have the funds to pay the premiums due Protective for February 2005, and used funds provided by American Capital to pay these premiums. Such payments were possible in light of American Capital's January 25, 2005, agreement to fund Service Transport's immediate financial obligations.

During this same time Service Transport was also seeking outside funding. However, in an e-mail dated January 25, 2005, from Robert Brooks ("Brooks") to Steven Price ("Price"), both members of the Operations Team assigned by American Capital to Service Transport, Brooks stated, "I will shutdown the efforts on outside bridge loans tomorrow AM and reset the focus to deliver on the results." (Pfs. Ex. 15). That same day another e-mail was sent by Brooks to Price and to the third member of the Operations Team, Omar Syed ("Syed"), in which Brooks wrote "[w]e will now shift the focus to making the business . . . go." (Id.).

In response to discussions and an e-mail from Syed, Ira Wagner ("Wagner"), the Chief Operating Officer of American Capital and a member of its Investment Committee, approved two million dollars to fund Service Transport's operations. In a follow-up e-mail dated February 3, 2005, Wagner wrote, "I am very reluctantly approving this and you can be ceratin that this is the last nickel I will approve for this company." (Pf. Ex. 15).

On February 5, 2005, Syed, after reviewing Service Transport's Revenue Report for the first four days of February 2005, sent Brooks an e-mail in which he stated "[t]his is not looking good. We are starting lower than we did in January. This falls short both of plan and the revised revenue forecast[.]" (Pfs. Ex. 17). Brooks responded "I agree . . . this is very concerning." (Id.).

On February 21, 2005, a conference call was held between Brooks, Syed, and Jeffrey MacDowell ("MacDowell"), American Capital's Managing Director and a Member of its Investment

4

Committee, during which they discussed options for Service Transport, including preparing the business for an asset sale if sales did not rebound. Syed indicated at the time that he thought the chances of a rebound were "slim." (Pf. Ex. 18).

Two days later, MacDowell sent an e-mail to the Operations Team at Service Transport in which he indicated that LaSalle Bank, Service Transport's primary lender, was "turning the screw" and that Service Transport could "count on them being less cooperative." Syed replied that Service Transport was "already in default, so not anything significant would change." (Pf. Ex. 20).

Recognition of the poor performance of Service Transport continued in e-mails between members of the Operations Team. On February 25, 2005, Syed sent Brooks an e-mail regarding the most recent daily report in which he wrote, "[t]his is absolutely terrible! . . . I think the writing may very well be on the wall," to which Brooks responded, "it is UGLY." (Pf. Exs. 21 & 22).

On March 10, 2005, American Capital's FACT Team prepared a quarterly report on Service Transport. The document included an "Exit Strategy" section which read:

> [American Capital] is in the process of locating a buyer in the next 30 days for asset value, if no buyer is obtained [American Capital] will liquidate the Company at the end of April. Consequently, we plan to seek bankruptcy counsel to protect [American Capital's] interests if we approach the probability of "filing" the Company. We will be seeking Sam Flax's counsel on the process, timing, and potential buyers.

(Pfs. Ex. 8). The report contained no statement that Service Transport was seeking financing or buyers for Service Transport's

5

assets. With respect to growth, the report indicated "there are no immediate plans to grow via acquisitions until the Company's liquidity situation improves." Id.

On March 17, 2005, Brooks sent Price an e-mail which indicated that Service Transport was hoping to get to the middle or end of April without making additional liquidity available if revenues remained at current levels. The e-mail also contained thoughts on ways to help Service Transport, including changing payroll (by paying bimonthly instead of weekly), reducing salaries by 10 percent and then repaying that with interest, or pursuing one of three investors who might be interested in the company. (Pf. Ex. 23). In making those observations, Brooks noted that "[w]hile we believe we should continue to 'stay the course' and continue to believe in our plan, we also believe it prudent to develop and have these contingency actions in the ready with clear timelines and plans." Id.

A March 28, 2005 FACT Team report contained a section entitled "Bankruptcy Preparation" which stated:

> At this point, we do not recommend [American Capital] funding additional monies to the Company. Consequently, we also plan to seek bankruptcy counsel to protect [American Capital's] interests if we approach the probability of "filing" the Company.

(Pfs. Ex. 26). However, as with earlier reports, the report also included discussions about how to reduce expenses (such as through wage reductions) and contained a separate section on contacting potential buyers in which it was noted that back in January 2005, Service Transport came across several interested buyers, some of

6

whom might still be interested in acquiring the company. The report identified Kelley Capital (a managed family fund), an individual named Scott Niswonger ("Niswonger") (who was involved in the trucking business in Tennessee), as well as two corporate concerns, Central Trucking ("CenTra") and Vitran. The latter two were noted to have regularly inquired of MacDowell about a purchase and were seen as potential "strategic buyers." The report noted that preliminary contact with Kelley Capital and Niswonger would be made within the next two weeks. (Pfs. Ex. 26).

Joseph Chandler ("Chandler"), Service Transport's Chief Executive Officer, prepared a schematic and "Updated Findings and Conclusions" for a conference call on March 25, 2005. The schematic, entitled "Divestiture Decision Tree," provided the courses of action over a span of weeks which would need to be taken if Service Transport was to continue to operate with a view towards selling or if it were to liquidate. (Pfs. Ex. 29). The Updated Findings and Conclusions noted that if the company did nothing and the projections of revenue proved true, the cash would "dry up" in mid-April. However, if wage cuts were implemented, the company could remain liquid through September. It was also recognized that while more could be done to improve the operations of Service Transport, the current projections did not show acceptable levels of return of interest for American Capital and therefore the divestiture outline had been developed for purposes of discussion. It was further noted that the company was at "a critical crossroads

7

and . . . looking for guidance regarding the 'go-forward' direction." (Pfs. Ex. 31).

By March 30, 2005, American Capital had retained the services of a liquidation expert, Charlene Pedrolie ("Pedrolie"). In an e-mail, Brooks told Pedrolie that, as per their discussions, Service Transport was simultaneously considering three scenarios:

> › Execute the revenue increase plan to generate the cash needed to keep the Company liquid.
> › Work with a short list of high potential, capable buyers to execute a sale of the business before we run out of cash at the end of April.
> › Develop a detailed Liquidation plan that <u>preserves every possible $$$</u> for [American Capital], mitigates potential litigation, etc. Be prepared to execute it if the first two actions fail. This action is 80% + probable so we need to **put it on a path to execute** and only take it off if the others become tangible and a clear decision is made to do so.

(Pf. Ex. 32, bold and underline in original). Price sent an e-mail to Pedrolie in which he recognized that "it is highly likely that the Board will decide to liquidate the company by the end of April." In that e-mail, Price also noted that "we are going to work hard to find a buyer for the business" and that Pedrolie was to work with Chandler "to ensure Service Transport was ready to liquidate if a buyer was not found by the end of the month." (Pf. Ex. 33). Price reiterated that Service Transport was continuing to work in "trying to keep the business running and sell it" and that if that avenue panned out they wanted Pedrolie to help in closing the sale. (<u>Id</u>.).

On April 8, 2005, an e-mail was sent from Service Transport's CEO Chandler, to American Capital's Managing Director that listed

five potential buyers of Service Transport. The list expressed various interest levels of the potential buyers, but contained no reference to any financing that any of these buyers would provide Service Transport. (Pfs. Ex. 35).

On April 17, 2005 Brooks and MacDowell exchanged e-mails in which MacDowell observed that a shutdown and liquidation could result in no recovery for American Capital and that about the best they could hope for was to find financing or a buyer. In those e-mails both referenced in passing potential WARN Act liability. (Pfs. Ex. 37).

In mid-to-late April 2005, Kelley Capital, a potential buyer, demanded as a prerequisite to negotiations that it be permitted to speak with Service Transport's primary lender, LaSalle Bank, to see if it could persuade LaSalle Bank to allow it to purchase Service Transport's debt at a discount. Service Transport's Board of Directors did not believe it appropriate to approach LaSalle Bank at that time with such a request because it was still looking at other potential investors, including Vitran and Central Transport ("CenTra"). (MacDowell Dep. at 88-84).

Representatives of American Capital and CenTra met on April 19, 2005. Thereafter, CenTra prepared a draft letter of intent dated April 22, 2005 for the purchase of the assets of Service Transport. Among other things, the draft letter of intent listed a range for the proposed purchase price, the assets to be purchased, and the liabilities to be assumed. The draft letter of intent also indicated that the buyer would agree to hire the close

9

to 1,000 Service Transport employees on terms substantially similar to their current terms of employment. (Pfs. Ex. 39).

By April 27, 2005, the nature of the agreement between CenTra and Service Transport changed. CenTra reaffirmed it was not interested in acquiring the stock of Service Transport but was only interested in preserving the assets and jobs of Service Transport while it underwent a sale of the assets and orderly liquidation of the company. CenTra's stated "objective is to preserve the customer and employee base, ultimately achieving either a confirmation of a plan of reorganization under which the reorganized Service Transport would continue, or an orderly liquidation and shutdown whereby an affiliate of [CenTra] would acquire the employee and customer base (and any other operating assets acquired as the highest bidder)." (Pfs. Ex. 41).

On May 3, 2005, CenTra's Vice President, Thomas Crist, sent a letter to MacDowell in which he noted that over the past couple of weeks Service Transport and CenTra had been trying to reach an agreement which would maintain the jobs of Service Transport's employees. He indicated that it appeared that the managers of Service Transport, CenTra, and American Capital were all in favor of a deal, but that LaSalle Bank was being inflexible in negotiating and that inflexibility would thwart any possible sale. (Pfs. Ex. 42).

No letter of intent or final contract was ever executed by American Capital or Service Transport with CenTra or any other

potential buyer for the purchase of Service Transport or its assets.

On May 5, 2005, Chandler, CEO of Service Transport, sent a Memorandum addressed to the Terminal Managers, Executive Staff, and General Staff of Service Transport ("Memorandum") with the subject heading "Orderly Wind-Down." In that Memorandum, Chandler wrote:

> For a number of weeks, we have been working with companies possibly interested in buying Service Transport, but yesterday evening, negotiations broke down with the last of the potential buyers. The Company can no longer finance its continuing losses, and we must begin the orderly discontinuation of operations. We will deliver all shipments currently in our system; however we will not pick up shipments or accept shipments at the dock. Our bank is working with us to finance the wind-down of operations, including the payroll of employees.
>
> You will need your morning shifts to load out and deliver freight. At noon, Thursday, all jobs are considered abolished and all employees are on layoff, without bid start times or bid runs . . . .
>
>        *            *            *
>
> Notice under the Workers Compensation Adjustment and Retraining Notification Act has been mailed to employees' homes, and a copy of that notice is posted with this Memorandum.
>
>        *            *            *

(Pf. Ex. 46). In a letter of that same date addressed "Dear Service Transport, Inc. Employees," ("Letter") Chandler wrote:

> As you have been aware, Service Transport, Inc. has been in the process of attempting to institute an operational turnaround since mid 2004. We have been making every effort to stabilize and preserve the business; however, as announced today, Service Transport has determined that it is unable to continue its operations and is commencing an orderly discontinuation of operations as of today, May 5, 2005.

11

Under current circumstances, we have determined it prudent and practical to serve official notification under the Worker Adjustment and Retraining Notice Act ("WARN"). The shutdown that commenced today will result in the closing of the company's headquarters and various freight terminals (listed on the attached). Reductions in staff are commencing immediately and will continue over the next several months during the wind-down of operations. Consequently, all of Service Transport's approximately 1,000 employees will be permanently terminated in several phases beginning on this date with no opportunity to bump into other positions. We will continue to provide details as soon as they become available.

(Pfs. Ex. 47). Attached thereto was an "IMPORTANT NOTICE TO ALL EMPLOYEES" which reiterated that a sale had fallen through the previous evening. In the middle of the page, the Notice contained a heading "JOB CANCELLATION AND LAYOFF" which informed employees that "effective 12:00 noon on May 25, 2005, all jobs are considered cancelled [.]"

On May 5, 2005, the Letter was posted on the bulletin board or placed on a table at several Service Transport facilities. The letter (but not the Memorandum or "Important Notice") was also mailed on May 6, 2005, to all Service Transport employees.

Until the shutdown actually occurred on May 5, 2005 (which had been ordered late on the evening of May 4, 2005 or early on the morning of May 5, 2005) Service Transport was operating normally. After the shutdown, Service Transport endeavored to deliver the shipments which were in transit.

## II. <u>LEGAL ANALYSIS</u>

Based upon the foregoing events, Plaintiffs filed suit contending that the shutdowns and/or layoffs at Service Transport

12

were not conducted in accordance with the WARN Act. In its Answer to Plaintiffs' Amended Complaint, American Capital raises numerous "Affirmative Defenses," including (1) Service Transport was a "faltering company" within the meaning of the WARN Act; (2) Service Transport was presented with "unforeseeable business circumstances" within the meaning of the WARN Act; (3) Service Transport was a "liquidating fiduciary" under the WARN Act; (4) Service Transport is an indispensable party which has not been joined in this action; and (5) Service Transport's potential liability should be reduced because it acted in good faith to comply with the WARN Act. Plaintiffs seek summary judgment in relation to each of these "Affirmative Defenses," while American Capital claims it is entitled to judgment under the law based upon any of the first three of these "Affirmative Defenses." Additionally, American Capital has filed a Motion to Strike certain declarations which were filed on behalf of Plaintiffs in support of their Motion for Partial Summary Judgment.

## A. AMERICAN CAPITAL'S MOTION TO STRIKE

In support of their Motion for Partial Summary Judgment, Plaintiffs tendered the declarations of Vance Conner ("Conner"), Robert Raiteri ("Raiteri"), and Brad Wade ("Wade"), who were the terminal managers of Service Transport's Charlotte, Atlanta and Memphis terminals, respectively. American Capital moves to strike (Docket Entry No. 121) their declarations because none of the three individuals was identified by Plaintiffs in their Rule 26 disclosures, discovery responses, or supplements thereto. In

13

response, Plaintiffs claim that the terminal managers were identified on a number of occasions during the discovery in this matter and, therefore, their existence as potential witnesses is no surprise to American Capital (Docket Entry No. 136).

Under Rule 26 of the Federal Rules of Civil Procedure,

> A party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances:
>
> > (2) A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Fed. R. Civ.P. 26(e).

As the foregoing excerpt from Rule 26(e) makes clear, parties are to supplement responses unless the additional information has "otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(2). In this case, Plaintiffs claim that each of the terminal managers at issue in the Motion to Strike were identified on a number of occasions during the discovery in this matter. Specifically, Plaintiffs claim:

> Connor was identified by Quincy Bullard in his deposition taken on March 29, 2006 as the Manager of the Charlotte Terminal. See, Exhibit A, Deposition of Bullard at 17. Connor was also identified by Carm McKissick as the Terminal Manager and a potential witness in his deposition. See, Exhibit B, Deposition of McKissick at

14

127-28. He was also identified by Jay Niendorf as the Manager of Charlotte. See, Exhibit C, Deposition of Niendorf 15-16.

Raiteri was identified as the terminal manager by Frances Perry in her deposition taken on March 30, 2006. He was identified on five separate occasions in the deposition. See, Exhibit D, Deposition of Perry at 8-9, 14-15, 24-25, 51, 68.

Joe Chandler, Service Transport's President, was deposed on September 27, 2006 regarding the notice and the memo to terminal managers. Specifically there were references to Brad Wade at pages 199 to 201, Vance Conner at page 203 and Robert Raiteri at page 204. See, Exhibit F, Depo of Chandler at 199-201 and 203-04.

(Docket Entry No. 136 at 1-2). Moreover, in their initial disclosures, Plaintiffs identified "other former employees who worked at facilities of Service Transport, Inc. located in LaVergne, Tennessee; Charlotte, North Carolina; Atlanta, Georgia; Memphis, Tennessee; and Cookeville, Tennessee" as potential witnesses (Docket Entry No. 122, ¶ (A)(1)). Defendant made no objection to this broad, non-specific category of witnesses, and Defendant had personnel records to identify the members of this large group of putative witnesses.[1] In addition the proof of class notice mailing included the address of each and every individual who was a potential class member, including Connor, Wade and Raiteri. (Docket Entry No. 64, Ex. B).

Given Plaintiffs' representations, the Court finds under the circumstances that although Conner, Raiteri and Wade, terminal managers at Charlotte, Atlanta, and Memphis respectively, were not disclosed or supplemented in accordance with the Rules, the present

---

[1] If requested by the Defendant, the Court would have required Plaintiff to identify each such witness in accordance with the requirements of Rule 26(a)(1).

15

situation is to be governed by the "otherwise" clause in Rule 26(e)(2). See, Gutierrez v. AT & T Broadband, LLC, 382 F.3d 725, 733 (7th Cir. 2004)(district court did not err in failing to strike affidavit of witness where witness was identified in 30(b)(6) deposition as having relevant information); Coleman v. Keebler Co., 997 F.Supp. 1102, 1107 (N.D. Ind. 1998)("[t]he duty to supplement imposed by Fed. R. Civ. P. 26(e)(1) does not require application of form over substance and hence where plaintiffs brought the identities of two witnesses to defendant's attention during deposition, Rule 26(e)(1) was "effectively satisfied"). Accordingly, American Capital's Motion to Strike will be denied.

**B.  SUMMARY JUDGMENT MOTIONS**

**1.  Standard of Review**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

16

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### 2. **General Background of WARN Act**

"The WARN Act was adopted in response to the extensive worker dislocation that occurred in the 1970 and 1980s." Hotel Employees and Restaurant Employees Intern. Union Local 54 v. Elsinore Shore Assoc., 173 F.3d 175, 182 (3d Cir. 1999). "As companies were merged, acquired, or closed, many employees lost their jobs without notice" and "[i]n some circumstances, the projected closing was concealed from the employees." Id. To remedy this, the WARN Act was enacted and designed to allow workers "to adjust to the prospective loss of employment, to seek and obtain alternative jobs and . . . to enter skill training or retraining that will allow

17

[them] to successfully compete in the job market." 20 C.F.R. § 639.1(a).

Under the WARN Act, "[a]n employer shall not order a plant closing or mass layoff until the end of a 60 day period after the employer serves written notice of such an order" to either the employees or their representatives. Failure to comply with the notice provision exposes the employer for up to sixty days of back pay for each affected employee. 29 U.S.C § 2104(a).

There are four exceptions to the sixty-day notice requirement, three of which are pled here as "Affirmative Defenses": the faltering company, the unforeseeable circumstances and the liquidating fiduciary exceptions.[2] "Because the WARN Act is remedial legislation, its exceptions are to be construed narrowly" and the "employer relying on the exception bears the burden of persuasion." <u>Local Union 7107 v. Clinchfield Coal Co.</u>, 124 F.3d 639, 640-41 (4th Cir. 1997). An employer relying on any of the exceptions "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3).

**3.  The Faltering Company Exception**

In order to establish the faltering company exception, a company must show (1) it was actively seeking capital or business at the time when the 60-day notice would have been due; (2) it must

---

[2]There is another exception to the 60-day notice requirement under the WARN Act for closures or lay-off due to natural disasters.

18

have had a realistic opportunity to obtain the sought after financing or business; (3) such financing or business sought must have been sufficient, if obtained, to postpone or prevent the plant closing; and (4) it had to believe reasonably and in good faith that giving the required termination notice would have precluded the ability to obtain the needed financing or business. 20 C.F.R. § 639.9(a). The regulations provide that this exception should be narrowly construed. Id.

Plaintiffs contend this Affirmative Defense should be dismissed because Service Transport was not actively seeking financing 60 days before the May 5, 2005 shutdown and, in any event, had no realistic opportunity of securing financing. Plaintiffs also argue the faltering business exception does not apply to the sale of a business. On the other hand, Defendant asserts that based upon this Affirmative Defense it is entitled to summary judgment

As early as January 25, 2005, members of the Operations Team assigned by American Capital to Service Transport indicated they would "shutdown the efforts on outside bridge loans tomorrow a.m." and "shift the focus to making the business . . . go." On February 3, 2005, after approving two million dollars from American Capital to fund Service Transport's operations, American Capital's Chief Executive Officer stated he was "very reluctantly approving this and . . . this is the last nickle I will approve for this company." On February 23, 2005, the Operations Committee received notice that Service Transport's lead banker, LaSalle Bank, was

19

"turning the screw" and would be less cooperative, but since Service Transport was already in default on its loans with LaSalle Bank, nothing significant would change. Subsequent daily reports regarding Service Transport's poor performance received comments from the Operations Committee such as "the writing may very well be on the wall" and "it is ugly." By March 10, 2005, American Capital prepared an "exit strategy" document which provided that American Capital was in the process of locating a buyer for Service Transport within the next thirty days. If no buyer was found, the plan was to liquidate the company at the end of April. Also, American Capital was to seek bankruptcy counsel to protect American Capital's interests if Service Transport approached the "probability of filing." There was no mention of further financing by American Capital or seeking financing elsewhere.

This Court concludes that this exception is inapplicable where, as here, the closings and/or layoffs occur as a result of a failed sale of the business. The language of the statute and the regulations promulgated pursuant thereto speak in terms of the employer seeking capital or business which would allow the employer to avoid a shutdown, not a sale of the company which would allow another entity to run the company:

> An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably believed that giving the notice would have precluded the employer from obtaining the necessary capital or business.

29 U.S.C. § 2102(b)(1). Similarly, under the regulations, to be "actively seeking capital" a company must be "seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit or business through any other commercially reasonable method." 20 C.F.R. § 639.9(a)(1).

The legislative history also supports the conclusion that the faltering business exception does not apply in the case of a sale. In a conference report which was drafted to explain Congress' intent in adopting the WARN Act, Congress set forth what it intended in regards to the "faltering company exception":

> FALTERING COMPANY. The provision would permit, under specifically defined circumstances, an employer to shut down one or more sites of employment without providing the full notice required by the bill. The defense is intended as a narrow one applicable only where it was unclear 60 days before the closing whether the closing would occur; the employer was actively pursuing measures that would avoid or indefinitely postpone the closing; and the employer reasonably believed both that it had a realistic opportunity of obtaining the necessary capital or business and that giving notice would prevent the employer's actions from succeeding.
>
> The key phrases are first that the employer was "actively seeking capital or business"; second that, had the employer obtained this capital or business, it "would have enabled the employer" to prevent or forestall the shutdown; and third, that the employer "reasonably and in good faith believed" that giving the notice required would have precluded the employer from obtaining the necessary capital or business that it had a realistic opportunity to obtain. Thus, to avail itself of this defense an employer must prove the specific steps it had taken, at or shortly before the time notice would have been required, to obtain a loan, to issue bonds or stock, or to secure new business. This duty to seek capital or business falls on the employer, not the single site

21

alone, and assumes that the employer lacks the necessary
capital or business.  Moreover, the employer must show
the reasonable basis for its good-faith belief that
giving the required notice would have prevented the
employer from obtaining the capital or business that the
employer had a realistic opportunity to obtain. Finally,
the employer also must show that, upon learning that the
workplace would be closed, it promptly notified the
employees and explained why earlier notice had not been
given.

Local 397, Int'l Union of Electronics v. Midwest Fasteners, Inc.,

763 F.Supp. 78, 83 (D.N.J. 1990)(quoting, Cong. Rec. S8686).  This

report in conjunction with the statute have been read as supporting

the conclusion that the faltering company exception does not apply

to attempts to sell:

> If Congress intended a sale to fall within this
> exception, it would have expressed such an intent.
> Instead, Congress restricted what it specifically
> referred to as a "narrow" exception to the activities of
> seeking capital, such as obtaining loans, issuing bonds
> or stock, or the activity of securing new business.
>
> There is further evidence that Congress did not intend
> this narrow exception to apply to the sale of a plant. In
> the Act itself, Congress specifically addressed the
> allocation of the burden of providing notice when a sale
> of the business occurs. 29 U.S.C. § 2101(b)(1). This
> compels the conclusion that Congress did not overlook the
> possibility that a sale might affect a plant closing.
>
> Consequently, Congress did not intend a sale to relieve
> an employer from its obligation to notify its employees.

Id.; see also, Wallace v. Detroit Coke Corp., 818 F.Supp. 192, 197-

198 (E.D. Mich. 1993)("Here, rather than keeping the plant afloat,

Crane tried to sell it – an option not covered under the

exception").

Further support for this Court's conclusion can be found in

Carpenters Dist. Council v. Dillard Dept. Stores, 15 F.3d 1275,

1281 (5th Cir. 1994) where the Fifth Circuit held that the faltering company exception "applies only when a layoff is caused by the employer's failure to obtain sufficient capital." In that case, the Fifth Circuit addressed the faltering company exception in the context of a merger between Dillard Department Stores and D.H. Holmes, a company which was undergoing a steady decline in profits and revenues. In finding the faltering company exception inapplicable, the court wrote:

> In this case, however, there is no causal connection between Holmes's search for capital and the ultimate reduction in work force. Although it is true that at the time notice should have been provided Holmes was actively searching for a new line of credit, the actual cause of the mass layoff was not a failure to obtain an adequate line of credit; instead, the cause of the layoff was the merger between Holmes and Dillard. Because there was no causal relationship between Holmes's search for additional capital and the reduction in its work force, the "faltering company" exception does not apply to exempt it from liability for failing to give notice for the ultimate layoff, which was in fact caused by the merger.

Id. at 1281.

In this case, the proof before the Court shows that neither American Capital nor Service Transport reasonably believed both (1) that Service Transport had a realistic opportunity of obtaining the necessary capital or business and (2) that giving notice would prevent the employer's actions from succeeding. As such, there is no causal connection between any effort Service Transport may have taken in seeking capital and the ultimate closings and layoffs. The cause was not the failure to obtain sufficient funding; instead it was the failure of the deal whereby CenTra would purchase and

23

then run Service Transport. Because there was no causal relationship between a search for capital and the layoffs and closing, and because the statute and regulations limit the faltering company exception to the inability to raise more capital, Plaintiffs are entitled to summary judgment on this "Affirmative Defense."

**4.  <u>The Unforeseen Business Circumstances Exception</u>**

The Act provides that the 60-day notice period is reduced where the "mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). This is commonly known as the "unforeseeable business circumstances" exception.

The Department of Labor has provided some guidance regarding when the "unforeseen business circumstances" exception applies but, in so doing has "eschewed *per se* rules and instead encouraged a case-by-case examination of the facts." <u>Roquet v. Arthur Andersen LLP</u>, 385 F.3d 585, 588 (7th Cir. 2005). A business circumstance may be reasonably unforeseeable if it was caused by some sudden, dramatic, and unexpected action, or by conditions outside the employer's control." <u>Id</u>. citing, 20 C.F.R. § 639.9(b)(1). "When determining whether a mass layoff was caused by unforeseeable business circumstances, courts evaluate whether a similarly situated employer exercising reasonable judgment could have foreseen the circumstances that caused the layoff. <u>Id</u>. A company will not be liable if, when confronted with potentially devastating occurrences, it reacts the same way that other reasonable employers

24

within its own market would react.  Watson v. Michigan Indus.
Holdings, Inc., 311 F.3d 760, 765 (6th Cir. 2002).

In this case, Plaintiffs argue that the May 5, 2005 plant
closings and layoffs were not the result of some sudden dramatic
and unexpected action or condition.  Rather, the result was part of
an escalating decline as indicated by the fact that for two years
the company had not shown a profit and had been in default on its
financial obligations to its primary lender (LaSalle Bank) and
others long before the closings and layoffs occurred.  American
Capital counters that the unforeseen circumstance was the failure
of the CenTra transaction.

Whether or not the ultimate demise of Service Transport was
foreseeable presents questions of fact not answered by the present
record.  True, Service Transport had been in a steady financial
decline for some time.  However, the WARN Act was not intended to
deter companies from fighting to stay afloat.  As stated by the
Sixth Circuit in Watson:

> WARN was not intended to force financially fragile, yet
> economically viable, employers to provide WARN notice and
> close its doors when there is a *possibility* that the
> business may fail at some undetermined time in the
> future.  Such a reading of the Act would force many
> employers to lay off their employees prematurely, harming
> precisely those individuals WARN attempts to protect.  A
> company that is struggling to survive financially may be
> able to continue on for years and it was not Congress's
> intent to force such a company to close its doors to
> comply with WARN's notice requirement.

Watson, 311 F.3d at 765.

Moreover, the mere possibility that Service Transport would
fail is not the issue.  Instead, "[i]n determining whether a

25

crippling business circumstance is foreseeable, we must bear in mind that "it is the 'probability of occurrence that makes a business circumstance "reasonably foreseeable,"' rather than the 'mere possibility of such a circumstance.'" Watson, 311 F.3d at 765; see, Roquet, 398 F.3d at 588 (where circumstances suggested that closure was "possible? Certainly. But probable? No," WARN Act did not require 60-day notice); Halkias v. General Dynamics Corp. 137 F.3d 333, 336 (5th Cir. 1998)(business circumstances triggering layoff must be "probable" to be reasonably foreseeable; a lesser standard of "possibility would be impracticable").

The summary judgment record can be read as showing that a reasonable company in Service Transport's position would have reacted as it did. Confronted with continuing losses it fought for survival and turned to layoffs and shutdowns when its last hopes dissipated with the collapse of the deal with CenTra. See, Roquet, 398 F.3d at 590 ("WARN Act defendants need not show that the circumstances which caused a plant closing or mass layoff arose from out of the blue to qualify for the exception.").

On the other hand, the summary judgment record can be read as showing that the inability to sell Service Transport was not a sudden, dramatic or unexpected event but rather was a reasonably foreseeable event. Evidence supporting this view includes any of a number of facts, including Service Transport's lack of profit for the previous two years; its default on its financial covenants with its primary lender as early as January 2004; the June 2004 assignment of an operations group by American Capital to implement

26

a turn-around; Service Transport's inability to pay its premium payment in February 2005 (which was necessary for it to operate as a common carrier) without an infusion of cash by American Capital; American Capital's infusion of that cash with the clear understanding that no more would be forthcoming; the deferral of rental payments in early 2005; observations by American Capital executives in February and March 2005 that Service Transport's financial reports were "terrible" and the "handwriting is on the wall"; the retention of a liquidation expert and the implementation of a liquidation plan; and LaSalle Bank's apparent unwillingness to subordinate debt. Such facts imply that an asset sale was unlikely at the time notice should have been provided to Service Transport's employees.[3]

Apart from arguing that the demise of Service Transport was foreseeable, Plaintiffs assert Defendant cannot take advantage of this defense because the notice it gave was inadequate and was not properly distributed. This Court rejects that argument.

With regard to distribution, Plaintiffs appear to be arguing that because the notice was not mailed until May 5 or 6, 2005, but the layoffs occurred on May 5, 2006, they were not given the

---

[3]Further complicating matters is Plaintiffs' contention that American Capital and Service Transport are a single employer under the WARN Act. This has not been briefed as a part of the cross motions for summary judgment but potentially has a bearing on the unforeseeable business circumstances exception since the shutdown must be "caused by some sudden, traumatic, and unexpected action outside the employer's control." 20 C.F.R. 639.9(b)(1)(emphasis added).

advance "in hand notice" contemplated by the regulations. 20 C.F.R. 639.8. Plaintiffs then cite cases which stand for the proposition that where no notice is given prior to plant closings or mass layoff, the employer is liable for 60 days worth of pay and benefits.

However, this is not a case about failure to give notice. Notice was sent to managers, executive staff and general staff, posted on bulletin boards, and mailed to each employee. There is no evidence presented which would suggest any of the Plaintiffs or the members of the class they purport to represent did not know of the shutdowns and layoffs within twenty-four hours of the decision to close Service Transport. The method of notice under the circumstance was practicable. <u>See</u>, 20 C.F.R. § 639.8 (indicating that at least with regard to notice where it is given in contemplation of a shutdown sixty days in advance, "any reasonable method of delivery to the parties suffices" including first class mail and personal delivery).

The Court also concludes, based upon the summary judgment record,[4] that the substance of the notice was sufficient. When the notice period is shortened due to the faltering company or

_____

[4]The Court reserves the option of revisiting the entire Notice issue during the trial on the merits. This is because while all of the documents taken together met the requirements of the WARN Act, there is some suggestion in the record that the "Notice" which was posted on bulletin boards, etc., may not have been so posted at some of the plants. The exact notice received and whether some employees only received a letter without any further notification may have some bearing on American Capital's liability and this Court is leaving open further consideration of this matter.

28

unforeseen business circumstances exceptions, the employer must give as much notice as practicable and "at the time notice actually is given, [the employer must] provide a brief statement of the reason for reducing the notice period[.]" 20 C.F.R. § 639.9.  Such notice assists employees "in determining whether the notice period was properly shortened." Alacorn v. Keller Indus., Inc., 27 F.3d 386, 389 (9th Cir. 1994).  While the Act itself does not specify what the brief statement must contain, "[t]he plain language of the statute indicates only that the statement should be 'brief,' and that it should state the 'basis' for the shortened notice requirement." Id.

In this case, the letter and notice provide a brief statement of the basis for the shortened notice requirement.  The letter to the employees dated May 5, 2005 indicated that, as the employees were well-aware, since mid-2004, Service Transport had been attempting to institute an operational turnaround but that, "as announced today, Service Transport has determined that it is unable to continue its operations and is commencing an orderly discontinuation of operations as of today, May 5, 2005." (Pf. Ex. 47).  The "IMPORTANT NOTICE TO ALL EMPLOYEES" began by stating a pending sale of Service Transport "fell through last night and we can no longer finance the continuing losses of Service Transport. We will begin the orderly discontinuation of operation on Thursday May 5."  This was followed by a paragraph which began "JOB CANCELLATION AND LAYOFF: Effective 12:00 noon May 5, 2005, all jobs are canceled[.]" (PF. Ex. 48).

29

Combined, these documents constituted sufficient notice under the WARN Act and hence summary judgment will not be granted on the unforeseen business circumstances exception based upon the alleged deficiencies in notice. However, factual questions remain about whether Service Transport closed due to unforeseeable business circumstances. Accordingly, genuine issues of material fact exist which make summary judgment inappropriate on this subject so the parties' cross-motions for summary judgment on this "Affirmative Defense" will be denied.

### 5. **The Liquidating Fiduciary Exception**

American Capital claims it was exempted from the 60-day notice period under the WARN Act under the liquidating fiduciary exception. It argues that under the WARN Act, a covered "employer" must be a "business enterprise," but a fiduciary whose duty is to liquidate a failed business is not such an "employer" because the liquidating entity "is not operating as a business enterprise."

In support of its argument, American Capital places primary reliance upon <u>In re United Healthcare Sys., Inc.</u>, 200 F.3d 170 (3d Cir. 1999). There, United Healthcare, a provider of hospital and healthcare services in the Newark area in serious financial straits, informed the New Jersey Department of Health that it was closing its hospital and healthcare facilities. On that same day, it also surrendered its certificates of need, the Department of Health revoked its certificates of need, and United Healthcare filed a voluntary Chapter 11 bankruptcy petition and provided its 1300 employees with 60-days' notice of termination of employment

30

pursuant to the WARN Act. Id. at 173. Within 48 hours after United Healthcare issued the WARN notice, all of its patients had either been transferred to another hospital or sent home. Thereafter, United Healthcare employees were unable to perform their regular duties, including caring for patients but instead cleaned, took inventory and prepared the company's assets for sale. Id.

Ten days later the Creditors' Committee filed a motion asking the bankruptcy court to order United Healthcare to terminate all of its employees immediately with no payment under the WARN Act for the balance of the 60-day notice period. While United Healthcare and the Committee agreed that the employees should be paid for the period they had worked, they disagreed as to whether the employees should be paid for the remainder of the 60-day notice period. The Committee argued that United Healthcare "ceased to be an 'employer' subject to the WARN Act once it surrendered its certificates of need". Id. at 174.

The bankruptcy court rejected the Committee's argument finding that "United Healthcare remained an 'employer' subject to the Act after it filed its bankruptcy because it continued to employ its 1300 person workforce for sixteen days after the Chapter 11 petition was filed". Id. That decision was affirmed by the district court but reversed by the Third Circuit.

In reversing, the Third Circuit framed the issue as whether United Healthcare was an "employer" under the WARN Act and in making that determination the court indicated it would "consider whether the entity was 'engage[d] in business' during the time

31

prior to the plant closing or mass layoff." Id. at 177. Based upon the findings of fact adduced by the bankruptcy court, the Third Circuit concluded that United Healthcare, while in bankruptcy, "was operating not as a 'business operating as a going concern' but rather as a business liquidating its affairs" and did not "continue [] as an 'employer' within the meaning of the WARN Act when it assumed the role of fiduciary following the filing for bankruptcy." Id. The circuit court took pains to limit its holding to the facts before it, writing:

> Although we find WARN Act liability does not attach under these facts and circumstances, we do not foreclose the possibility that WARN Act liability may apply to other situations where an employer files for bankruptcy and then terminates its employees. An employer as fiduciary will succeed to its WARN Act obligations if an examination of the debtor's economic activities leading up to and during the bankruptcy proceedings reveals that the fiduciary has continued in an 'employer' capacity, operating the business as an ongoing concern.

Id. at 178.

Leaving aside that the court in United Healthcare recognized that in certain circumstances the WARN Act could apply even to an employer which files for bankruptcy and then terminates its employees, the facts in this case are wholly unlike those which were presented to the court in United Healthcare. On the morning of the shutdowns and layoffs, Service Transport was operating as a trucking business, even if it was only making the deliveries of those items which were already in the pipeline. It was, unlike United Healthcare, performing its normal business function and had

not filed a petition for bankruptcy when the WARN Act notices were sent.

A case presenting more analogous facts is <u>In re Jamesway Corp.</u>, 235 B.R. 329, 343 (Bkrtcy. S.D.N.Y. 1999). In that case, Jamesway, the employer, argued that immediately subsequent to the commencement of its liquidation, shutdown, and termination of its employees, its efforts were geared towards finalizing the planning, documentation and other activities necessary to file a liquidation case under Chapter 11 of the Bankruptcy Code. Its position was that once it began its Chapter 11 case, it was a liquidating fiduciary and did not succeed to the notice obligations of its pre-bankruptcy entity. In rejecting this argument, the court in Jamesway wrote:

> Jamesway concedes that on October 12, 1995, its directors voted to liquidate the company and authorized Jamesway to file a liquidating chapter 11 case. It also admits that when it fired the . . . plaintiffs on October 12, it did so in furtherance of its liquidation, and that as of that day, it had identified all the plaintiffs as employees that would lose their jobs in the ensuing liquidation, and formulated a schedule for firing them. Under WARN, an employer must give written notice of a plant closing or mass layoff to "affected employees." See 29 U.S.C. § 2102(a)(1). Those are "employee[s] who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer." <u>Id</u>. U.S.C. § 2101(a)(5); <u>see also</u>, 20 C.F.R. § 639.6(b) ("Notice is required to be given to employees who may reasonably be expected to experience employment loss.") As of October 12, the plaintiffs plainly were "affected employees" entitled to WARN notice. When Jamesway failed to serve them with such notice, it became liable to them under the Act. The subsequent filing of the bankruptcy petition did not divest it of its obligations under WARN to those employees.

<u>Id</u>. at 343-44.

33

Likewise in this case, Service Transport's employees were slated for discharge at the time the shutdown decision was made late in the night on May 4, 2005. At that moment Service Transport was still a business enterprise and, although American Capital had a loose plan for an exit strategy which included a stated intent to liquidate its assets, Service Transport had not taken any specific steps to begin the liquidation.

To accept American Capital's assertion that it was a liquidating fiduciary under the facts of this case would be to allow the liquidating fiduciary exception to swallow the rule. Such an interpretation of the exception would strip employees of the WARN Act's protection whenever an employer decides to terminate its employees and, before implementing that decision, starts to take preliminary steps towards liquidation, while otherwise continuing to carry on its business. Such an interpretation would eviscerate the WARN Act and be an expansion of an exception which is to be construed narrowly. Accordingly, Plaintiffs will be granted summary judgment on this "Affirmative Defense" and Defendant's cross-motion for summary judgment will be denied.

**6. Good Faith Defense**

Plaintiffs move for summary judgment on American Capital's "good faith" defense. Under the WARN Act, liability may be reduced at the discretion of the Court where an employer who has violated the Act "proves to the satisfaction of the court that the act or omission . . . was in good faith and the employer had reasonable

34

grounds for believing that act or omission was not a violation of [the Act]." 29 U.S.C. § 2104(a)(4).

Plaintiffs claim American Capital is not entitled to the good faith defense because American Capital must show that it had the subjective intent to comply with the WARN Act and that its actions in attempting to comply with the act were objectively reasonable. Plaintiffs argue that because American Capital has allegedly failed to disclose whatever discussions it may have had with counsel about the timing and substance of notice under the WARN Act and because it allegedly cannot avail itself of any of the exceptions to the 60-day notice provision, American Capital has not met its burden of proof on this defense. (Docket Entry No. 125 at 45). The Court rejects that argument.

While American Capital will have the burden of proving its good faith defense at trial, at the summary judgment stage it does not have the burden of showing that there are no genuine issues of material fact on this issue or the burden of showing that it is entitled to judgment as a matter of law. That is Plaintiffs' burden at this stage of the proceedings. Moreover, this Court has already noted that American Capital may be able to avail itself of the unforeseeable business circumstances exception and that the combined notices were sufficient. On this record, the assessment of American Capital's subjective belief and whether its actions were objectively reasonable is a question of fact which must be resolved at trial. See, Saxion v. Titan-C-Manufacturing, Inc., 86 F.3d 553, 561 (6th Cir. 1996)("Any assessment of an employer's good

35

faith or grounds for its belief in the legal propriety of its conduct is necessarily a finding of fact[.]").

**7.** **Indispensable Party Defense**

Plaintiffs move for summary judgment on American Capital's "Affirmative Defense" that Plaintiffs have failed to join an indispensable party, namely, Service Transport. American Capital has made no effort to join Service Transport as a party, nor does it make any arguments in relation to the need for Service Transport to be a party in this action.

The allegations in this case suggest that, if anything, Service Transport was a joint tortfeasor or co-conspirator in the alleged failure to comply with the WARN Act by failing to provide notice 60 days or more prior to the closings and layoffs. However, because of joint and several liability, joint tortfeasors and co-conspirators are not indispensable parties under the Federal Rules of Civil Procedure. <u>Curry v. U.S. Bulk Transport, Inc.</u>, 462 F.3d 536, 543 n. 4 (6th Cir. 2006); <u>Paine Webber, Inc. v. Cohen</u>, 276 F.3d 197, 204 (6th Cir. 2001). Moreover, "[t]he 'complete relief' provision of Rule 19(a) does not concern any subsequent relief via contribution or indemnification for which the absent party may later be responsible." <u>DeWitt v. Daley</u>, 336 B.R. 552, 556 (S.D. Fl. 2006) quoting, <u>Bedel v. Thompson</u>, 103 F.R.D. 78, 80 (S.D. Ohio, 1984). Accordingly, summary judgment will be granted in Plaintiffs' favor on this "Affirmative Defense."

36

**8. Mitigation Defense**

Finally, Plaintiffs move for summary judgment on American Capital's "mitigation defense." In this "Affirmative Defense," American Capital claims that it is entitled to a reduction in damages to the extent that the Plaintiffs have failed to mitigate their damages.

The WARN Act provides employers with specified reductions from the 60-day liquidated penalty provision of the Act for the amounts paid by the employer for the violation period. 29 U.S.C. § 2104(a)(2). Absent from the reduction provisions are amounts that the employees could have earned or did earn by working elsewhere. Thus, "[u]nder WARN, an employer is entitled to reduce its liability to aggrieved employees only by those payments within the categories set forth in § 2104(a)(2)." Dillard Dept. Stores, 15 F.3d at 1283 n. 14. "The WARN Act, however, does not include a provision that would allow an employer to deduct wages earned by an employee from other sources." Id. Accordingly, Plaintiffs are entitled to summary judgment on American Capital's mitigation "Affirmative Defense."

### IV. CONCLUSION

On the basis of the foregoing, American Capital's Motion to Strike (Docket Entry No. 121) will be denied. Plaintiffs' Motion for Partial Summary Judgment (Docket Entry No. 123) will be granted in part and denied in part. The Motion will be granted with respect to American Capital's Faltering Company, Liquidating Fiduciary, Indispensable Party and Mitigation "Affirmative

37

Defenses" but denied with respect to American Capital's Unforeseen Business Circumstances and Good Faith "Affirmative Defenses." American Capital's Motion for Summary Judgment (Docket Entry No. 115) will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

38